Mr. Chief Justice Watkins delivered the opinion of the Court. This was a suit in chancery in the Chicot circuit court, and from the record before us, the case appears to be this : On the 6th January, 1845, Duncan G. Campbell, domiciled in Arkansas, where his property was situate, made and published his will in the State of Mississippi, where he had gone temporarily on a visit. The provisions of the will are as follows : “Item 2. I bequeath all my property to my brother Samuel Campbell, my sister Jane Bickerstaff, Mary Campbell and Flora Anne Campbell, to be equally divided among them, after deducting therefrom five thousand dollars, which I bequeath to Viney, a yellow girl, and one hundred dollars to my uncle, John Nicholson, of Marshall county, Miss.: 3d. I wish my sister Mary to take charge of the above named Viney, and take care of her until she arrives to the age of fifteen years, when she is to be free and receive her legacy : 4th. I wish my uncle John to receive his hundred dollars out of the next crop : 5th. Should the girl Viney die before she arrives to the age of fifteen years, it is my wish that the legacy go to my sister Mary. I appoint my brother Samuel executor of my estate.” The testator died without any lawful issue. The girl Viney w,as his daughter b5r one of his slaves, and at the time of his death was about three years old. Samuel Campbell qualified as executor on the 7th of October, 1845, and continued to act for near two years, when he was removed by the probate court, on the motion of his securities, for alleged breaches of his trust, and on the 7th July, 1847, letters of administration, with the will annexed, were granted to Cornelius Campbell. On the 3d January, 1848, Samuel Campbell and Jane Bicker-staff, Mary and Flora Anne Campbell, with their husbands, exhibited their bill of complaint against Cornelius Campbell, individually and as administrator, and against the other appellees and their husbands, Cornelius Campbell and the other female defendants being also the brother and sister of the testator. The bill, which was subsequently amended so as to make Viney a party defendant, proceeded on the ground that the bequest to Vi-ney and so much of the will as puported to emancipate her, were contrary to law and public policy, and void; and, notwithstanding the will, Viney continued to be a slave and the property of the estate. That, as general legatees by the terms of the will, they were entitled to the whole estate after the payment of debts and the specific legacy of $100 to Nicholson. That more than two years had elapsed since the grant of letters testamentary, and no debts of any consequence remained to be paid. That the defendants claimed to be entitled as next of kin to distributive shares of the estate, and prayed that Cornelius Campbell, the administrator, might be decreed to account and turn over the entire residue of the estate to them after the payment of debts. Pending the suit, it being made to appear, to the chancellor, that Samuel Campbell, while he was executor, had removed Vi-ney to parts unknown, and sold her as a slav.e, she was declared to be a ward in chancery, and the court made a rule upon him to produce her by the next term. He failing to do this, was imprisoned for contempt. The guardian ad litem of Viney being directed by the court to ascertain where she was and reclaim her, lie at length found her in Missouri, where the executor had sold her, and recovered possession of her by habeas corpus. Cornelius Campbell and Viney answered • — • a decree pro con-fesso being taken against the other defendants. Cornelius Campbell rendered an account of the entire estate which had come to his hands as administrator. His answer and exhibits showed that the appraised value of the land and the proceeds of the sale of the negroes and personal property, which the executor had not removed or wasted, would not amount to five thousand dollars, and that the executor had removed from the State and was insolvent. The answer insisted that the intention of the testator was, as he had often expressed during his lifetime, to liberate Vi-ney, and as the estate had turned out, the bequest of five thousand dollars to her was virtually a bequest of the whole estate; and which, in the event of her death before arriving to the age of fifteen years, according to the will of the testator, would go to his sister Mary, so that the complainants had no exclusive right to the estate as general legatees. Viney answered, claiming that she was entitled to her freedom under the will, and to so much of the estate as was necessary to make up the legacy bequeathed to her. On the hearing, the court decreed that Viney was free by the will; that the legacy of five thousand dollar's vested in her immediately on the testator’s death; and because, so far as then appeared, the estate was not worth more than five thousand dollars, the bill was dismissed, and Cornelius Campbell having given bond and security, as required by the order of the court, was appointed guardian for Yiney. It is contended, for the appellants, that the act of the 20th of January, 1848, is by necessary implication a repeal of so much of the Revised Statutes, which went into force on the 20th of March, 1839, as authorized the emancipation of slaves; and 2d, if it is not, that the devise in this case being to take effect in fu-turo. and not in presentí, upon the consummation of the will by the death of the testator, the bequest is void under our statute and upon grounds of public policy. On the other hand, it is argued for the appellees, that the legacy to Yiney must be regarded as a vested one and a present gift of freedom, in order to uphold the clear intention of the will; and if this is not so, various authorities are cited in support of the position that a future or prospective emancipation, whether by deed or will, is valid, and that the legacy of five thousand dollars to Yiney is not void, and does not lapse for want of present capacity in her to take. According to the view we take of this will, the consideration of most of the questions discussed at bar, is necessarily waived. The leading rule in the construction of wills, is to give effect to what appears to be the intention of the testator, in view of all the provisions of the will; and if this intention can be ascertained, it should be carried out, unless contrary to law or against public policy. A careful examination of the will in question, leads us to the conclusion that it was clearly the intention of the testator that Yiney should be liberated immediately upon his decease : not merely by reason of the bequest to her of $5,000, by present words of gift, for we should be loath to sanction the principle at this day, and with reference to the condition of slave property in the southern States of this Union, that a mere bequest to a slave would operate as an emancipation: not merely by reason of the intention of the testator as manifested, that in case of the death of Yiney before she arrived to the age of fifteen years, his legacy would go to his sister Mary, but because the will no where contemplates that Viney should serve any one, or remain in a state of slavery until she attained the age of fifteen years. Notwithstanding the expression in the third clause of the will, that Yiney is to be free at the age of fifteen years, and receive her legacy, it is coupled with the wish of the testator that his sistery Mary should take charge of Yiney, and take care of her until she arrived to that age. So, that if the testator had said, in so many words, that he liberated Yiney, and committed the testamentary guardianship of her to his sister Mary, until she arrived to- the age of fifteen years, the effect would, in our judgment, have been the same. Considering that Yiney was the child of the testator, that she was of tender years, that it was necessary, under our statute, for him to make some adequate provision for her support, to prevent her from becoming a charge on the public, at the same time confiding the care and custody of the child to one of his nearest relations, for whom he signified his preference over all others, the will appears to be as sensible and judicious a one, albeit not technically framed, as any man in the unhappy condition of the testator, could well have made. According to this construction of the will, the legacy to Viney was clearly a vested one, under Moody vs. Walker, (3 Ark. 147,) and the executor or administrator, with the will annexed, would be authoiized to turn over to the guardian of Viney, the legacy bequeathed to her, so that the interest, or income of it, could be appropriated, if need be, to her maintenance, coming fully within the decision in Blackburn vs. Hawkins, 1 Eng. 51. We may agree with the counsel for the appellants in the conclusion to which his argument tends, that under the constitution and laws of this State, the power to emancipate slaves is derived from the statute, and can only be exercised in the mode directed by the statute. That the act of emancipation cannot be treated as a contract between the master and the slave, or with any person for his benefit; but, as an act of renunciation, on the part of the master, and until it is consummated either by deed or will, in the public and solemn manner required by law, the right of the master, or his legal representatives, to absolute dominion and property in the slave, remains unimpaired. But the enquiry is, if there is any thing in the act of the 20th of January, 1843, which inhibits the emancipation of slaves, by a repeal of the pre-exist-ing law. By the statute of 1839, (Revised Statutes, title Emancipation,) the legislature, in accordance with the authority conferred by the constitution, enacted that the owner of slaves may emancipate them by last will and testament, or by deed, attested by two witnesses; and acknowledged or proved in the circuit court of the county where he resides. After declaring the effect which such emancipation shall have, to make the slave as fully and perfectly free as if he had been born so, the statute proceeds to save the rights of all creditors of the person emancipating prior to the emcipation, as if the same had not been made, and protects the rights of the public by providing that the person emancipating the slave, and his estate shall be held to support and maintain the slave, if not of sound mind, or over the age of forty-five years, or being a male, is under the age of twenty-oneyears, or a female, under the age of eighteen years. By the statutes of 1839, in force at the same time, (ch. 103, title Negroes and Mulattoes,) it was enacted that no free negro e or mulatto should thereafter be permitted to emigrate to, or settle in this State, unless he complied with certain requisites, that is, within twenty days after his arrival, to produce to the clerk of the county court of the county in which he wishes to settle, a certificate of his freedom, and enter into bond to the State of Arkansas, for the use of any county that might be damnified, with security in a sum not less than five hundred dollars, conditioned for his good behaviour, and to pay for his support, in case he should, at any time thereafter, be unable to support himself, and become chargeable to any county. The penalty on conviction of any free negro or mulatto, for a violation of this law, was fine and imprisonment, until the fine be paid, or until be be discharged according to law, and a sentence that he immediately depart the State. At the same time, and as part of one general system of laws, there was enacted a statute, (Digest of 1839, title Freedom.) regulating the mode of suit, according to which any person, illegally held in slavery, might assert his right to freedom. The act of the 20th of January, 1843, the title of which is, “ An act to prohibit the immigration and settlement of free negroes, or free persons of color, to this State,” was designed to prevent the increase of free negroes in this State by emigration from abroad; being an absolute prohibition, under severe penalties to such immigration or settlement after the 1st of March, 1843, while as-to those already residing here, or who might immigrate prior to the 1st of March, 1843, provisions were re-enacted equally stringent, by which they were required to produce and record the evidence of their freedom, and give bond for their good behaviour and ability to maintain themselves. This act contains an express repeal of so much of chap. 103, before referred to, as is inconsistent with it, but no allusion is made to the title “ Emancipation,” and though the act of 1843 implies a change of policy, as to the increase of free negroes, we cannot intend that it is a repeal by implication of the law authorizing emancipation, if both can stand and have effect, without doing violence to either. Even in those States where emancipation is prohibited, (unless done by act of assembly) there seems to be no objection to a deed or will liberating slaves, if it provides for their speedy removal out of the State. (Leech vs. Cooley, 6 S. & M. 93. Wade vs. The Am. Colonization Society, 7 S. & M. 663. Cooper vs. Blakey, 10 Georgia 263, referring to Vance vs. Crawford, 4 Georgia 446.) Our statutes contain no such express prohibition, the effect of which would be to impose upon other States, the burthen of an- unfortunate class of population, which we have thrown off as insupportable. We will not imply such a prohibition, because it would imply a want of comity to our sister States. The act of 1843 was not retaliatory, but a measure of self-defence, declaring that while this State will not be infested with the free negroes of other States, we will tolerate the evils resulting from the emancipation of our own slaves, until such time as the sense of the people may require an avowed change of policy. We understand the decree of the circuit court to be, without prejudice to the right of the appellants, to institute proceedings anew against the administrator, whenever it can be made to appear that the assets of the estate exceed the debts and specific legacies. On the case made before it, the decree is, in our opinion, right, and ought to be affirmed.